The following petition for a re-hearing was presented by
Mr. Bibb:.
CARMICHAEL, &c. ads. ELMONDORFF. Petition for re-hearing.
The counsel for the defendants in ejectment acknowledges the ability with which the legal questions arising in the cause, have been discussed in the opinion delivered; yet it is most respectfully suggested, that some of the questions deserve the re-consideration of the court, and that one question, having an important bearing in favor of the defendants, is wholly pretermití-ted.
That a grant from the commonwealth to an alien, is void, is expressly declared in the books, as cited by the court. The distinction between a purchase by an alien of an individual, and a grant procured by him from the government, is worthy to be noted. In the former,his purchase inures to the use of the government, to pass, upon office found, the title which has been previously divested, back again to the government; the title is passing, not from, but to the government. In the latter, the title would pass from the government, that the government might seize it to its use. Does the law thus operate so vainly, effect so useless a matter, create that 'it may destroy, defeat one of its fundamental rules forbidding aliens to acquire the right to soil, that by another operation it may preserve its policy pass its title for the vanity of being at the éxpencefend litigation of taking it back? Common sense and right reason, of which the law is the perfection, pronounce that in such case nothing passes by the grant of the commonwealth to the alien. The grant is void in the commencement. A grant takes effect by operation of law, and the law will not work its own destruction^
•1 Litt. 415.
1 Litt. 416.
Again; if the government be deceived in a grant, it is utterly void. Earl of Devonshire’s case, 11 Coke 90; Colt vs. Glover, 1 Rolles’ Rep. 451-469.
The procurement of a grant by an alien, must be by deceit and concealment; for if tlie fact had been known, it is not lawful that such á grant should have been made; because an alien is forbidden by law to acquire the title to land. If he purchase from an individual, he may hold, until office finding the fact; but title he cannot have. He cannot have “just cause of possessing;” and therefore he cannoT maintain an action, real or mixed. Coke Litt. 129 b. Litt. sec. 198.
But it is supposed ft the opinion, that the inflexible rule of the common law, prohibiting aliens from acquiring title to land, is in some degree changed or modified by the act of Virginia of 1779. The permissions to aliens are therein thus declared:
“ All persons, as well foreigners as others, shall have right to assign or transfer warrants or certificates of survey for lands; and any foreigner purchasing lands, Inay locate and have the same surveyed, and after returning a certificate of survey to the land-office, shall ba allowed the term of eighteen months, either to become a Citizen, or to transfer his right in such certificate of survey to some citizen of this or any other of the United States of America.”
“ Due returns of the several articles herein before required, being made into the land-office, the register, within not less than six, nor more than nine months, shall make out a grant, by way of deed poll, to the party having right,” &c. “ upon which grant the register shall endorse that the party hath title to the same.”
“ Where a grant shall be made to the heir or assignee of a person claiming under any of the before mentioned rights, the material circumstances of the title shall be recited in such grant.”
Such are the expressions of the act more immediately connected vpth this subject; and the counsel most respectfully dedftres, that he considers these provisions as plainly indicating the will and avowed intention that a grant should 'not issue to an alien. The act most distinctly specifies how far an alien -may progress, purchase or assign warrants, locate, survey ánd return the certificate of survey; but then he must either become a citizen, or transfer to a citizen of the United States Ms *479 right in such certificate of swMty. Here the maxim may be well applied, “ expressi'o unius est exclusio allerius the expression of some things that the alien may do, is to the exclusion of the*others. The distinction between right in a certificate of survey, and title by grant, is expressly taken by the statute. An alien may acquire the former; but to acquire the latter, he must become a citizen; or if not, he must transfer to a citizen; and time is given him to become a citizen or transfer, not the grant, but the certificate of survey. But time is given —-eighteen months, to make his election; if the grant is arrested during tliat term, then the limitation would be effectual; but if the grant issued, to the alien, then the government would part with the title, for the purpose of annulling the grant, if he did not comply within the term; but if he elected to transfer, then the mode of transfer specially designated’, by assignment of the “ certificate of survey,” (so that the grant might recite the assignment,) could not be, because the grant had issued.
But the opinion suggests, that the register was bound to issue the grant within nine months after the return of the plat and certificate of survey; and, therefore, that it might issue to an alien, because eighteen months were given him to make his election. This argument in the opinion is based upon the postulatum, that the nine months relate emphatically to the time of the return of the plat and certificate of survey; whei’eas the expressions are, “ due returns of the several articles herein before required, being made- into the land-office, the register, within not less than six, nor more than nine months, shall make out a grant.” The time, then, does not relate merely to the return of the plat and certificate of survey; for by inspecting the previous part of the act, it will be found, that a return of the copy of the judgment in caveat, if one has,been filed, is embraced by the expression “ several articles;” and there is nothing strained or outre, to include within those several articles, due returns of citizenship acquired, or of the transfer of the certificate of survey. Here it may be remarked, that by requiring the grants generally, in favor of assignees, to wait six months at least after assignment lodged, instead of issuing them at the end of six months in favor of an assignee recently returning the assignment, additional security was afforded against *480 surreptitious grants. But suppose the general direction to issue grants at the end of six months, is to be computed from the time of returning the plat and certificate of survey to the register’s office; it is evident, that this general rule must have its exception in case of a caveat not determined within nine months from the registration of the survey. And it would be equally within the scope and plain intention of the act, to except also the case of an alien returning his certificate of survey with a memorandum thereon that he was an alien. In such case, the register would comply with his duty, to suspend the grant for the term of eighteen months, unless a certificate of citizenship should be sooner returned, or an assignment. Upon such return of evidence of citizenship, or of transfer, the register could, in due time thereafter, issue the grant, truly endorsing that the party had “ ¿¿He” to the grant, and reciting the “ material circumstances of the title.” Under these constructions, all the parts of the statute will harmonize; the safeguards against grants to aliens will be preserved. The fundamental principle of the common law, denying to aliens the right to acquire the soil 0f pae country, (which common law had been adopted by an ordinance of 1776,) will not be repealed by implication., nor by the provisions of a statute plainly acknowledging the propriety of that r,ule of the common law, and seeking to enforce it. Moreover, the policy of the act, to encourage migration and increase of the population of the United States, then in their infancy, engaged in a struggle with the mother country, which put in requisition all the resources of money and men, and of allegiance too, would be better consulted. It is a settled rule of construction, that the common law is not to be repealed by implication; that if the common law and the statute may stand together, the common law is not repealed — the confliction must be positive and direct. I intreat the court to pause, and to consider what part of the act of 1779 indicates an intention to suffer an alien to push his claim into a grant. Do next the provisions of the statute manifest the intention of the legislature that an alien should not have a grant? Do they not plainly declare that he may proceed as far as to return his certificate of survey, but not farther towards obtaining a grant to himself whilst he remains an alien? The portentous consequences of a contrary *481 doctrine, connected with thé stipulations in the treaty bf 1?94, in favor of British subjects “ who now hold,” Cannot be foreseen.
C'iwn. P-evi-chapfs,0} 6.’
*481 The act of 1796, p¡ 41, noticed by the court, was evidently petitioned for, and p.assed by the legislature upon a belief that the doctrine now contended for by me is correct. The proviso in that act will be noticed hereafter more particularly, but ought not to be overlooked in explaining the legal doctrine now under consideration.
It is conceded in the opinion, that if A. sells without title, and afterwards acquires title, it inures to the benefit of his vendee. So if he sells to B. and then to C. and after the title of B. accrues or comes to him, it shall inure to the benefit of C. But it is supposed that these effects are produced by estoppel or warranty, or as a punishment jm fraud; and as the slate cannot be estopped, has not warranted, and cannot be impeached of fraud, that, therefore, when the grant to Robertus S. Brandt? vested in the commonwealth upon his death, for want of an heir capable of inheriting, that such investiture did hot inure to the benefit of the junior grantees. Esto}v pel by virtue warranty, is one class of cases only, amongst others, where subsequent acquisition of title by a vender, inures to the benefit of the vendee. Even there, the deed and warranty is but the evidence of the contract; and it is by virtue of the contract of sale, and of that good faith and moral obligation thereby imposed on the vender, that a court of law, as well as a Court of equity, would estop the vender from claiming the land of his vendee, because the vender had sold without title, but had since acquired it. In such case, of salé, even without warranty, the same rule would substantially be applied; but whether in a court of iaw or of equity, may be a question of form. Even where a veniee of a defective title purchases in, fairly and for his protection, the better title, he is in equity considered as the trustee and agent of his vender, if he will pay the purchase. There, no fraud nor warranty operates. In ail these cases, the rule is applied between the parties, by courts of law and by courts of conscience, because it is intrinsically just and right jpiot that it is jitst and' right, because it is so adjudicated or decreed. That fraud, bad faith, or technical estoppel, cannot be applied to the government, will not be ques-- *482 tioned. The King can do no wrong; th'e Commón-wealth can do no wrong. The commonwealth cannot be charged with fraud. If wrong be done by act of the government through its agents, 'the wrong is charged to the oflicers and agents of the government. But because, in contemplation of law, the government cannot •intend wrong, nor commit a fraud, it does not therefore follow", that the acts of the government never do prove wrongful and oppressive. The difference of similar acts, as between the government and its citizens, and between citizen and citizen, is between fact and intention, crime and innocence. The fact is yet foci, although done in the name of the government; and the injury to the ciiizen is not the less, because it comes from the potent arm of the commonwealth. The moral obligation to repair the injury, adheres to government, as well as to the citizen. If a citizen receives my money forme, upon a consideration which happens tb fail, he is morally bound to refund it; so of the government. If a citizen, without my assent, converts my property to his use, he is bound to compensate; whether acquired by force or fraud, or by finding, may make some difference as to his guilt or innocence, as aipere question of ethics. If the government, for the general good, take individual property; or, in a treaty with a foreign power, cede private estate along with its own domain, to obtain an advantageous peace, the act of the government is neither fraudulent nor wrong, but praise-worth}"-; yet, by the opinion of all jurists, confirmed by the practice of civilized nations, the government is morally hound to make reparation. Not that all nations have the rule or guaranty set down in any constitution or other written stipulation in favor of the subject or citizen; but because the government is bound in good faith and sound morals. A government is, by its very existence and organization, bound to be a moral agent. It is composed of natural persons bound by the cords of justice and morality, and their union into a political compact constitutes a political being, bound by the same obligations of justice and morality. The union does not weaken nor dissolve those obligations. It is but too, true, that sometimes a government feels power and forgets right; but it is the province of fhe jurist, civilian and judge, to inculcate and enforce the precepts of justice, morality and good faith; and above all, he *483 should forbear to arm frith the sword of justice, tbe hand of immoral force. Disclaiming,, then,--any argument against the commonwealth, drawn from imputations ofiraud, or warrant)'', pr intended wrong or dc-ceit, I do claim, from the high attributes of sovereignty, from the true meaning of the. rule, “the King can do no wrong,” from the untraversable legal intendment that the commonwealth cannot be guilty-of deceit, and is incapable of being perfidious or unjust, that the correlative rules must be applied to all .her physical acts;, that according to that moral excellence and immaculate purity of character in which she lives, and moves,., and hasher intellectual existence, she is bound tobo a moral agent; that from that very character of purity, all the physical operations of thfe government are to be weighed, expounded, understood and controlled; and. therefrom her responsibilities are to be adjudged.. In contemplating the government in this plenitude of moral-attributes and ideal existence, let us not forget that she has a real presence and agency in the affairs and fortunes of men; that by this actual presence and agency, acts are often done in her name and by her authority, which require the control of her moral character. Let us not forget that even the moral excellence of the Creator himself, cannot demolish the fuels, that this world exists; that actual oppressions, wrongs and iniquities have been committed by man on his fellowman. Bearing in mind these suggestions on the responsibilities of all governments having rank amongst civilized nations, I invite a review ofthe assertion, that the state of Virginia was under no responsibility, legal or equitable, to the junior patentees, upon warrants, entries and surveys, because she had prescribed the terms, and conditions, and modes of taking up her lands and suing out grants; that the holders of warrants were hound, at their peril, to search out vacant land, to lor cate, survey and obtain grants for that, and no.other, and if they failed in that, they ought not to complain, of the error of their own acts.
The defence of the country from the savages, the-dangers and privations by the .early settlers, were accepted by the government as a sufficient .consideration for those settlements and emoluments in land which, were conceded without a price in money. Those concessions of land, were held out as inducements to the *484 settlement and defence of the co'untry, and constitute & consideration of the highest value, to the protection of those claimants, The state price paid by all holders of pre-emption and other treasury rights, was likewise a valuable consideration received by the state, independent of the expenco and labor in locating, surveying and carrying into grant, and ail the office fees allowed by the government and charged upon the holders of warrants. All these considerations constituted a just claim upon the government for protection, by a wise, practicable and intelligible system of laws. Services, money, and officers’ fees, paid by tbe citizens, constitute as just a claim upon the government, for such a system of laws, in relation to the lands for which these were paid, as taxation does, to projection and prudent legislation generally. Was Caligula innocent, and all his subjects guilty, because they did not comply with laws which ]¡e suspended above their access, and in characters which they could not read? f am far from imputing to Virginia the depravity of wilful error, but most willingly believe she acted with the purest intentions, and most laudable spirit, in endeavoring to provide the means for sustaining the glorious contest in which she, in common with her sister states, was then engaged; but yet our own sad experience teaches us, that the system adopted for granting the vacant lands in Ken-, tacky, was bad in theory; in practice, impossible. The interfering land' claims have been produced by adopting a false and deceptive theory, not prudently arranged as a theory, and utterly impossible of execution. The supposition, that in a wilderness, infested by a savage enemy, abounding in canebrakes and forests unexplored and unknown, descriptions could be given by mere entry with the commissioners and surveyors, without maps, or charts, or topography, so that others coming after, could, by reading these locations, understand the precise spots intended, and thereby avoid them, and appropriate only the adjacent residuum, was taost untrue. Next, the office for the location of treasury warrants,was opened before the time limited for entering pre-emption warrants expired; and even the time limited for the entry of pre-emption warrants, was prolonged from time to time — they still retaining their pre-emp^ live dignity. The relative dignity and priority of pre-emptions appendant to actual settlements, a,nd to vji- *485 lage rights, and pre-emptions for marking and improving, and pre-emptions of 400 acres for actual settlement, were not clearly defined to the understanding of the persons upon whom the laws were to operate; but required the astuteness of lawyers and judges to settle by construction. Again, the greater part of the land being in one county, the entry might extend into another; and after the first thirty days of making entries, it was utterly impossibly that any human being could hare understood from the entry-hook in any county, what lands were located and what land was vacant. Again, the state did not compute the quantity of acres she had for market, and limit the number of acres to be sold,,by the quantity she had-for sale; but leaving this without control, warrants for three or four times the quantity she had for sale in the district set apart for treasury rights in Kentucky, 'were issued from the land-office. The consequence of such a chaotic system, was confusion worse confounded. The citizens are not blameable for not complying with requisitions not understood and impossible to be obeyed. Hence I conclude, that Virginia, in good faith and justice, was legally and equitably responsible to those persons who, under such a system, were induced to advance the valuable considerations before recited. As to the maximum of that reparation, it is not necessary to enquire, for any of the purposes of the present investigation, as it is confidently believed, that the rule of reparation here claimed is the minimum; that is to say, as any one .of these conflicting claims should, by any means, become vested in the commonwealth, they should not be re-granted, to the destruction, but should inure to the benefit, and quiet and confirmation of the other grantees. A rule so honest, so pure in conscience, so sound in morals, and enforced by government between citizen and citizen, cannot be otherwise when applied to that government at the instance of the citizen. That such has been the rule, as understood to be obligatory on the government, is manifested by the proviso in the act of 1796, before referred to. It is again recognized in the revenue law of 1801, 2Litt.464; wherein it is express1 ly declared, that in case of forfeiture, the adverse claim shall be as valid as if the forfeited claim bad never existed, unlpss the forfeited claim is redeemed within the time, given therein. That the commonwealth does not *486 hold herself absolved from moral obligation to refund money received upon a consideration which happens to fail, is manifested by the various provisions in the revenue laws, for refunding taxes on lands lost, or twice paid, apd for refunding the state price received on lands taken by better claims.
In the opinion delivered, the court have taken the position, that the junior grants under which the defendants claim, were void, and issued without authority of law, because of the elder grants to Brandtz, and have applied the maxim, “ quod ab initio non valet, in tractu temporis non convalescit, to the grants under which the defendants hold, to prevent the extinguishment of the grant to Brandtz upon his death without heirs, from enuring by way of confirmation and security of those junior grants. The counsel most earnestly calls upon the court to review those positions. The surveys upon which those junior grants issued, were made before the date of the grant to Brandtz, upon warrants issued from the land office; the priority and validity of locations can never be drawn in question in ejectment, ac•cording to the long and well established doctrines of this court. To argue then that the junior grants in question were void and incapable of confirmation and strength by the events which should be brought out by time, merely because they were younger grants, seem^ not conformable to, but in direct confliction with settled principles. It has been the uniform doctrine of this court, that the interest vested in the patentee by a junior grant, is a legal interest, subject to be treated as a legal estate; it is passed by deed; and the vendee has thereby the legal interest; so that, in a suit against the elder grant, neither the junior patentee, nor the mesne purchasers under the grant, but only the last Sendee having the deed and connection oflitle, by deed, under such junior grants, need be party to the bill. It can be used to enlarge the possession of one holding under it, beyond his actual enclosure, and to support an ejectment, the right of entry under the eldest grant being tolled by adverse possession; so that in the last case mentioned, the junior grant is rendered more-strong and confirmed, in tractu temporis.
As to the cases of Wilcox and Calloway 1. Wash. 33 and Jones vs Jones 1 Call. 568-9, the counsel most respectfully urges, that those adjudications are founded on *487 Alie peculiar provisions of the statutes. The one authorizing a petition for land, forfeited (by breach of condition contained in the grants) by nonpayment of quit rents, and want of cultivation; where, by the very expressions of the act, the petitioner asks for and is entitled, to the very Same title petitioned'against; and the very judgment of the court which ascertains the breach of the condition, gives right to the petitioner, to have the same title invested in him by a new grant, reciting the old, and the cause of the new, thereby operating, as it were, by conveyance of the old title; the other providing the means of obtaining inclusive grants and surplus lands, wherein the very object of the statute is to save the old title, not to surrender, forfeit, or destroy it: The new grants are continuations of the old titles, by a pro'cess in which the old title never does vest in the commonwealth, is not extinguished, merged or amalgamated in the general mass of public domain. Those proceed-:' ings by petition,- for land, for nonpayment of quit rents, and want of cultivation, inclusive grants, and surplus lands, are all, proceedings in rem; where the petitioner, and'defendant, actor and reus, are each seeking by express provision of law, the specific land, title afad interest. No interfering or conflicting interest, survey or grant is interposed. And the opinion of the court in both cases, expressly confines the relation of the new grant to the old, so as to avoid mesne grants, to the cases of quit reñís'and cultivation, inclusive patents and surplus lands. The expression of these, is the exclusion of all cases, where the estate and title obtained by a new grant, has been merged, dead and buried in the general proprietary rights of the commonwealth.
In the case of Wilcox and Calloway, there were three grants, one of 1764, one of 1774, and one of 1783. Cal-loway held the estate and retained it under the mesne grant of y 74, and by the decree of the court, he was not overreached by the grant'of 1783. In the case of Jones vs Jones, the inclusive grant was adjudged to vest an estate in joint tenancy, in the father and two sons, and not an estate in severalty in the three, according to their several interests under their former grants; because by so considering the effect of the new grant, the two sons, by survivorship, held equally. The equality .of division, intended by the father and the two sons, was preserved: and the eldest son was prevented from *488 getting all his father’s share as heir, to the exclusion oí his brother.
That case proves another position, that the grant oi the commonwealth for lands before granted, is not void, but may operate according to the intent of the parties and the equity of the circumstances under which it was obtained.
If the state can, by virtue of a new grant and declaration that it shall be knit to an old title once existing, but fallen to the commonwealth, and amalgamated with the general fund, thereby overreach mesne grants, what is to prevent the grant of parcels of land within "the boundaries of Richard Henderson and Co’s, purchase of the Indians, with a declaration that the new grantee shall hold it in the same manner as Richard Henderson and Co. might or could have done, had their grant been confirmed in the lifetime of said Richard Henderson? What, in 'such case, would protect the mesne grants from being overreached, but the principles asserted in this petition?
The acts of 1796 and of 1799, in pan materia, are to be taken together, and the proviso in the first act, saving the rights and title of all others, connected with the act of 1799, will explain each other, and shew that the legislature did not mean to resuscitate conflicting adverse claims, or violate vested interests. The act of Í796, with its savings, is not a confirmation of the claim of Brandtz, where it conflicted with the rights or title of others-, the grants of Virginia under which the de-, fendants hold, are within the proviso. In other words s if the commonwealth of Kentucky had a right, not conflicting with individual rights, she thereby released it; the saving of the rights of others, was a condition annexed to the estate of R. S. Brandtz. So Brandtz held it in his lifetime coupled with that condition; on his death without heir, the commonwealth toola his interest subject to that condition or proviso, as he had held it, and when she regranted it in 1799, she granted it with the condition annexed, as she received it oi'R. S« Brandtz by his death. So that the lessors of the plaintiff cannot have the land by virtue of the act of 1799, divested of the savings and condition annexed in the act of 1796.
It is conceded in the opinion, that upon the death of Robertus S. Brandtz, without heir capable to inherit, *489 tiié tille of Brandtz, ipso facto, vested in the commonwealth. It is equally, true that the lessors of the plaintiff, derive no legal conveyance under Brandtz; there is no privity of contract; their only title is by grant of the legislature of Kentucky, of December 1799. Vet by the opinion of the court, this grant of Kentucky is ¡made to interfere with, .and overreach, the previous vested interests of the defendants, under the warrants, locations and grants, from Virginia, perfected previous to the first day of September, seventeen hundred and ninety-one.
1
The fifth article of the compact with Virginia is in these words: “ That no grant of land, or land warrant to be issued, by thé .proposed state, shall interfere with tiny warrant heretofore issued from the land office of Virginia, which shall be located on land within the said district now liable thereto, on or before the first day of September 1792.” Can the grant by Kentucky in 1799, interfere with; or overreach the grants under which the defendants hold, without a breach of this article of the compact? Does not the claim of the lessors (>{ the plaintiff, begin with the grant ofitthis commonwealth in 1799? .Do they shew any title without that grant? But for that grant, would not the patents under which tire defendants hold, have been valid and complete? Is it not the grant of Kentucky, which has interfered with the warrants issued fromlthe land office, located, surveyed and granted by Virginia, long before .September 1791 ? This view of the subject is wholly pretermitted in the opinion delivered.
I do insist then, that the grant of the commonwealth, to an alien wras void; that nothing passed out of the commonwealth by it; that the act of 1779, so far from authorizing a grant to issue to an alien, is aplainnega-:¡ve to such agrant:
That the same rules of good faith, justice, and sound morals which bind man to man in society, bind the government to its citizens:
That Virginia was under moral obligations, to protect and secure, as far as she could, all those who have purchased her lands, under the act of 1779:
That reparation by government to a citizen for injuries or losses flowing from the act of the government, does not depend on the question of fraud orno fraud, wrongful or not wrongful; but is of acknowledged o.b- " *490 ligation, bj all civilized nations, growing out of the áüs ties which a government owes to its citizens or subjects:
That the junior grants under which the defendants hold, were not void, but vested interests, stipulated for in the articles of separation; (third and fifth articles.)
That upon the falling in of the grant ma.de to Rober-tas S. Brandtz for want of heirs, it inured to the benefit of the junior grantees:
That Virginia could not have regranted the title of Brandtz, to the destruction of her own grants, made before such acquisition oí Brandtz’s title, without a violation of good faith and moral obligation:
That Kentucky is at any rate prohibited from so doing, by the fifth article of the compact with Virginia, which is confirmed by'the constitution of Kentucky.
Á rc-hearing is respectfully solicited.
BIBB, for defendants.
But on the 20th of June 1823, it was overruled.